IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RAUL CARVAJAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 2958 |
| | ) | |
| LOUIS DOMINGUEZ, Jr., in his individual capacity, | ) ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER REGARDING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

JAMES F. HOLDERMAN, Chief Judge:

Plaintiff Raul Carvajal ("Carvajal")[1] filed a lawsuit under the legal principle articulated in *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971), alleging constitutional violations against defendant Louis Dominguez, Jr. ("Dominguez"), a Village of Bridgeview police officer who had been assigned to work with the U.S. Drug Enforcement Agency ("DEA") during the relevant time period. Dominguez has filed a motion for summary judgment (Dkt. No. 57). For the reasons stated below, the court grants the motion in part and denies the motion in part.

BACKGROUND

At issue in this case is whether Dominguez, when acting as an undercover agent for the DEA, knowingly and falsely identified Carvajal as a participant in a money laundering operation, for which Carvajal was arrested, tried, and eventually acquitted. In early April 2001,

---

[1] Raul Carvajal's name has been spelled in some documents in the record as Carbajal. Carvajal clarified in his deposition that the spelling "Carbajal" is incorrect. (Def. Ex. 5 at 67.)

1

a DEA agent from the Miami field office contacted Wayne Hunter ("Hunter"), a former Waukegan police officer assigned to work with the DEA as a task force officer in Chicago from 1992 until September 2001, regarding a money laundering investigation known as "Operation Double Trouble." (Def. Statement of Facts ("SOF") ¶¶ 5-6). Hunger was informed by an agent from the Miami field office that the money laundering organization was wire-transferring large amounts of United States currency from Chicago and the Chicago suburbs to southern Florida by utilizing sources with connections to Chicago area banks. (*Id.* at ¶ 15). Hunter became the primary case agent for the Chicago portion of Operation Double Trouble. (*Id.* at ¶ 6).

The Miami DEA agent requested from Hunter assistance in arranging two undercover money pick-ups in Chicago, providing Hunter with a cell phone number, (773)-422-3142, and a code to set up the pick-ups. (*Id.* at ¶¶ 7, 15). The parties dispute whether the Miami DEA agent told Hunter that an individual named "Raul Carbajal" was supervising the money laundering operation and used the cell phone number, provided to Hunter by the Miami DEA agent, to conduct his activities. (Pl. Resp. SOF ¶ 15.) Hunter testified at his deposition that he may have first learned of the name "Raul Carvajal" from the Miami DEA field office, or from an intelligence analyst in the Chicago DEA field office who traced the cell phone number supplied by the Miami DEA field office to Raul Carvajal's ex-wife, Arriella Carvajal. (SOF ¶ 16; Pl. Resp. SOF ¶ 15).

After obtaining the name "Raul Carvajal," a Chicago intelligence analyst named Kathleen O'Connell requested on April 9, 2001, from the Illinois Secretary of State a photo image of Raul Carvajal. (Pl. SOF ¶ 8; Def. Reply SOF ¶ 8). Hunter does not remember when the Chicago DEA field office received the image of Raul Carvajal from his driver's license, but

2

guessed at his deposition that the Illinois Secretary of State may have responded within a week of the April 9, 2001 request. (Pl. SOF ¶ 9; Def. Reply SOF ¶ 9). At his deposition, Hunter testified that he did not remember whether he had the image of Carvajal before April 16, 2001. (Def. Reply SOF ¶ 13). The parties do not dispute that, as of April 15, 2001, Hunter knew the name "Raul Carvajal," and, on May 3, 2001, Hunter opened a formal Chicago DEA field office file titled "Raul Carvajal." (Def. SOF ¶ 15; Pl. SOF ¶ 9; Def. Reply SOF ¶ 9).

Around the middle of April 2001, Dominguez, who worked in a cubicle next to Hunter while both were at the Chicago DEA field office, was asked by Hunter, after Hunter was contacted by the Miami DEA field office regarding the money laundering investigation, to act as an undercover agent for two money pick ups to take place on April 16, 2001 and April 23, 2001. (*Id.* at ¶ 8). Dominguez agreed, and then arranged and participated in the two April 2001 money pick ups in Chicago. (*Id.* at ¶ 9).

The parties dispute what knowledge Dominguez had about the money laundering investigation prior to participating in the first undercover operation on April 16, 2001. Dominguez has consistently testified that he had only the telephone number and code provided by the Miami DEA field office, and he denies that he had Carvajal's name and had seen a photographic image of Carvajal prior to the April 16, 2001 undercover operation . (Pl. SOF ¶ 14, 31; Def. Reply SOF ¶¶ 6, 14, 31). Disputing Dominguez's testimony, Carvajal points to Hunter's testimony that he knew Carvajal's name by April 15, 2001, and may have had a photographic image of Carvajal by April 16, 2001. (Pl. SOF ¶¶ 9-13). The parties agree that Hunter testified that he possibly gave Caravajal's name and photographic image to Dominguez prior to the April 16, 2001 undercover operation to make sure that Dominguez had all the

3

information about the case and that Dominguez was not meeting with someone he already knew. (Pl. SOF ¶¶ 13-14; Def. Reply SOF ¶¶ 13-14). Both parties also agree that Hunter would have given all the information he had about Carvajal, if he knew it, to Dominguez prior to the April 16, 2001 operation, including his name and photograph, and that the providing of the information would have been normal practice. (Pl. SOF ¶ 14; Def. Reply SOF ¶ 14).

According to Dominguez's two reports dated May 14, 2001 and his testimony, he called the cell phone number and code provided to Hunter by the Miami DEA field office and talk to two individuals that he later identified as German Matos Ruiz ("Ruiz") and Carvajal, and arranged to meet them. (Def. Ex. 9 at 1). Dominguez met with these two individuals, that he, according to his report, later identified as Ruiz and Carvajal, at the prearranged location and received from the individuals $421,431 in a suitcase. (Def. SOF ¶ 10). The two men, later identified by Dominguez as Ruiz and Carvajal, drove away together in a white Ford Escort driven by Carvajal. (Def. Ex. 9 at 2). Other officers followed the car for a period of time after the money pick up before ending the surveillance. (Pl. SOF ¶ 15). Although there were several surveillance agents present, including Hunter who testified that he was about 60 or 70 feet away, no photographic, videotaped or audiotaped evidence were taken of the April 16, 2001 operation. (Pl. SOF ¶ 16; Def. Reply SOF ¶ 16; Def. Reply Ex. 31 at 60). Carvajal denies that he was one of the men who participated in this transaction and contends that Dominguez knowingly and falsely identified him.

Dominguez arranged and participated in another transaction using the same cell phone number and code and with the same individuals on April 23, 2001, who this time arrived in a white pick up truck. (Def. Ex. 10 at 1-2.) Dominguez received a suitcase of $352,335 on this

4

occasion. (Def. Ex. 10 at 2.) Again, other surveillance agents were present, but no photographic, videotaped or audiotaped evidence were taken of the April 16, 2001 operation. (Pl. SOF ¶ 16; Def. Reply SOF ¶ 16). Dominguez again identified the individuals in second May 14, 2001 report as Ruiz and Carvajal.

According to Dominguez, between April 16, 2001 and the date of his written report, May 14, 2001, he was shown the photographic image of Carvajal requested from the Illinois Secretary of State and identified him as one of the men who participated in the April 16 and April 23, 2001 transactions. (Def. SOF ¶ 11). Dominguez could not recall whether he was shown another photograph besides Carvajal's at that time, and Dominguez stated that he was never shown a formal line-up. (Def. SOF ¶ 12.) Dominguez also remembers seeing other photographs on other days, but he could not remember the exact sequence or circumstances relating to the showing of other photographs. (*Id.*) No written report was made in connection to Dominguez's identification of Carvajal. In addition, Hunter testified at his deposition that he was unable to identify Carvajal when he first saw his photograph in April and May of 2001, but Hunter later recognized Carvajal while conducting a surveillance operation in July 2001. (Def. Reply SOF ¶ 27). Furthermore, Hunter testified at his deposition that he was reasonably certain at the time of Carvajal's trial that Carvajal was the man at the April 16, and 23, 2001 transactions, but he was not asked by the prosecutor whether he recognized Carvajal from those April 2001 transactions. (*Id.*). Another Chicago DEA agent "closed" the Carvajal file on August 9, 2002. (Def. SOF ¶ 18.) The closing report stated that no arrest had been made, but the Chicago DEA field office still hoped and expected that arrests would be made by the Miami DEA field office. (Pl. Resp. SOF ¶ 18).

In August 2002, two DEA agents (not Dominguez or Hunter) came to Carvajal's house and Carvajal consented to a search of his home, including a safe, because, according to Carvajal's later testimony at his criminal trial, he had nothing to hide. (Def. SOF ¶ 30; Pl. Resp. SOF ¶ 30). Neither side presented evidence of what was sought or what, if anything, was found during the search. There is also no evidence that Dominguez participated in this search.

Prosecutors in Miami later obtained an indictment from the grand jury of Carvajal and 33 other individuals for their alleged participation in the money laundering operation on April 17, 2003 and a superceding indictment on May 8, 2003; specifics involving Carvajal's actions in the money laundering operation were limited in the indictment and superceding indictment to his alleged participation as a money courier in the April 16 and April 23, 2001 transactions. (Def. SOF ¶ 19, 20; Pl. Resp. SOF ¶ 19, 20). The parties admit that Dominguez did not testify in any of the grand jury proceedings. (Pl. Resp. SOF ¶ 20.) Evidence about what was presented to the grand jury was not submitted in the record by either party.

On August 28, 2003, Carvajal was arrested in Chicago pursuant to the Florida superceding grand jury indictment and brought before a magistrate judge in Chicago. (Def. SOF ¶ 22). At the time of his arrest, Carvajal's house was again searched; Carvajal did not consent to this search. (Pl. Resp. SOF ¶ 30). There is no evidence in the record regarding what, if anything, was found during the search. Carvajal was released on a $50,000 bond and ordered removed to the Southern District of Florida. (*Id.*). On September 4, 2003, when Carvajal appeared before a district judge in the U.S. District Court for the Southern District of Florida, the judge approved a bond for Carvajal with several conditions not relevant to this litigation. (*Id.* at ¶ 23). Dominguez did not participate in any of these proceedings.

6

Later in the criminal proceedings, criminal defense counsel for Carvajal filed a motion to suppress Dominguez's identification of Carvajal, arguing that the one-photo procedure used to identify him was unduly suggestive and violated his due process rights. (Def. SOF ¶ 26). In the brief filed by the government in opposition to the motion, the prosecutor stated that one of the other surveillance officers at the April 16, and April 23, 2001 transactions could provide a detailed description of the two participants, yet the prosecutor called only Dominguez to testify at the hearing held on the suppression motion of Carvajal's identification by Dominguez. (Def. Reply SOF ¶ 31-32). After the hearing, the district judge denied the motion, holding that regardless of whether the procedure was impermissibly suggestive, there was not a substantial likelihood of misidentification because Dominguez had an excellent opportunity to view Carvajal at the time of the two money pick ups, there was no evidence that Dominguez was pressured to select Carvajal's photograph, and Dominguez was an experienced and trained law enforcement officer. (Def. SOF ¶ 28). The district court also made specific factual findings, including that, during surveillance of another money pickup that did not involve Dominguez, law enforcement officers observed a motor vehicle registered to Ariella Carvajal, the ex-wife of Raul Carvajal, and that the license plate of the one of the cars used in the April 2001 transactions was registered to a car leased by Matos Ruiz. (Def. Ex. 24 at 3).

Following the denial of Carvajal's motion to suppress, a criminal jury trial involving Carvajal and another defendant, Giovanni Alzate ("Alzate"), was held from May 10 to May 19, 2004. (Def. SOF ¶ 29). The prosecution called ten witnesses, including Dominguez and Hunter. (*Id.*) Carvajal called five witnesses, including his girlfriend and himself, to establish the defense that Carvajal was not present at the April 2001 transactions and did not participate in the money

7

laundering scheme. (*Id.*) Alzate was convicted and Carvajal was acquitted on May 26, 2004.

Carvajal believed that Dominguez was intentionally lying when he identified Carvajal during the trial as a participant in the two April 2001 transactions. When asked at his deposition why he believed that Dominguez's identification of him was an intentional lie, Carvajal responded that it was because he was not present at the transactions with Dominguez and because Dominguez, "when he saw [Carvajal] for the first time, he was literally shaking," and he could not look Carvajal in the eyes. (Def. SOF ¶ 34; Def. Ex. 5 at 126). Although Carvajal testified that Dominguez must have lied, Carvajal had never had any type of dispute or altercation with Dominguez before this case. (*Id.* at ¶ 34-35). Meanwhile, Dominguez has continued to testify in his deposition in this case that he was not mistaken in his identification of Carvajal. (Pl. Ex. A at 67).

On May 18, 2005, Carvajal filed this litigation against Dominguez in his individual capacity, alleging that Dominguez intentionally lied when identifying Carvajal as a participant in the money laundering scheme. Carvajal raised several claims, including (1) Count I: "false arrest, unlawful search, and seizure pending trial"; (2) Count II: "deprivation of liberty"; (3) Count III: "*Brady* violation/creation of false evidence," *see Brady v. Maryland*, 373 U.S. 83 (1963); (4) Count IV: "perjury by complaining witness." (Def. Ex. 1). Before this court is Dominguez's motion for summary judgment on each of Carvajal's claims.

## LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

8

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, this court takes all facts and inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires a trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). In considering a motion for summary judgment, this court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003). Finally, the evidence relied upon must be competent evidence of a type otherwise admissible at trial. *Stinnett*, 301 F.3d at 613.

## ANALYSIS

Count I—Carvajal's claims of false arrest, and unlawful search and seizure—depends on a finding that a reasonable jury could conclude that Dominguez played a material role in the indictment of Carvajal for money laundering.[2] Carvajal argues that Dominguez's reports and identification of Carvajal are the only evidence linking Carvajal to the April 16 and 23, 2001 transactions and thus the money laundering scheme. Dominguez, however, points out that Carvajal's belief that the only evidence linking him to the money-laundering scheme and the

---

[2]Carvajal cites to the 14th Amendment for his claims. The 14th Amendment applies to only state actors. Dominguez was assigned as a federal DEA agent during the relevant time period. To the extent Carvajal argues that Dominguez violated Carvajal's 14th Amendment rights, those claims are dismissed. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

9

April 2001 transaction comes from Dominguez is based on pure conjecture and speculation about what transpired before the grand jury. Dominguez asserts that Carvajal has not presented any evidence regarding the grand jury proceedings, and there are suggestions from the record in this case that there may have been additional, material evidence against Carvajal that could have been sufficient to indict Carvajal apart from Dominguez's identification and reports.

Without the evidence of the grand jury proceedings relating to Carvajal,[3] this court can only speculate whether Dominguez's identification and reports directly led to Carvajal's indictment, and subsequent arrest, search, and seizure based on the indictment. In support of Carvajal's argument that only Dominguez's identification and reports led to Carvajal's arrest, Carvajal states in his brief that the prosecutor expressly stated at the hearing on the motion to suppress that "no one was able to identify Carvajal other than Dominguez," and that Hunter admitted that "at the time of Carvajal's indictment, arrest and trial, there was no evidence against Carvajal other than Dominguez's identification." (Pl. Resp. at 3). Carvajal, however, presents both evidentiary facts without the requisite context. The prosecutor, in stating no one else was going to be able to identify Carvajal, at the suppression hearing, was directly addressing the judge's question with regard to the identification by Dominguez of Carvajal from the photograph as the individual at the April 2001 transactions. (Pl. Ex. E at 84). Hunter's statement also related directly to Dominguez's identification of Carvajal as the individual at the April 2001

---

[3]Although grand jury proceedings are presumptively secret, a litigant may obtain grand jury material, if the litigant shows that the information "is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that [the] request is structured to cover only the material needed." *Douglas Oil Co. v. Petrol Stops NW*, 441 U.S. 211, 222 (1979); *United States v. Campbell*, 324 F.3d 497, 498-99 (7th Cir. 2003) (per curiam).

transactions. (Pl Ex. B at 54). Furthermore, Hunter's statement could be understood to exclude himself from the statement that "no one" else could identify Carvajal other than Dominguez, given the entirety of Hunter's deposition testimony, which included statements that he later recognized Carvajal as the individual at the April 2001 transactions. Most importantly, none of this evidence excludes the possibility that other evidence independent of Dominguez's identification linked Carvajal to the money laundering operation, such as the cell phone registered to his ex-wife, was presented to the grand jury.

Moreover, contrary to Carvajal's argument that there was no other evidence to identify Carvajal as being involved in the April 16 and 23, 2001 transactions other than Dominguez's identification and reports, the Miami DEA field office provided Hunter with the cell phone number registered to Carvajal's ex-wife, as well as the correct code, that was used to arrange the two transactions. That the Miami field office obtained the cell phone number registered to Carvajal's ex-wife and the correct code to set up a money pick-up before Dominguez became involved in the investigation leads this court to believe that the grand jury indictment and superceding indictment could be based on evidence independent of Dominguez's identification and reports. What that additional evidence was, however, is only conjecture because Carvajal never attempted to present evidence to this court from those grand jury proceedings.

In addition, according to the government's brief in opposition to the motion to suppress, another surveillance officer was capable of identifying Carvajal from the transactions, and a car registered to Carvajal's ex-wife was observed during another surveillance. That the prosecutors relied only on Dominguez's identification of Carvajal at trial does not mean that this was the only evidence presented to the grand jury linking Carvajal to the money laundering scheme and

11

the April 2001 transactions. The rules of the grand jury allow the presentation of evidence not always admissible at trial, such as hearsay evidence, and the prosecutors may have reasons to not present certain evidence at trial, such as the protection of confidential sources and investigation tactics.

Without evidence regarding the grand jury proceedings, Carvajal's argument that Dominguez's identification of Carvajal and Dominguez's reports directly led to the indictment of Carvajal and thus the false arrest, and unlawful search and seizure of Carvajal is missing significant evidentiary support. The court grants summary judgment on Carvajal's claims of false arrest and unlawful search and seizure.

Count II of Carvajal's complaint, "deprivation of liberty," is barred by a another legal obstacle. Both parties treat Count II's "deprivation of liberty" as a constitutional claim of malicious prosecution. But a litigant cannot bring a constitutional tort of malicious prosecution where the state provides a remedy, and Illinois offers a state claim of malicious prosecution. *See Redwood v. Dobson*, 476 F.3d 462, 466 (7th Cir. 2007)*; Bontkowski v. Smith*, 305 F.3d 757, 760 (7th Cir. 2002) (malicious prosecution brought under *Bivens* against an FBI agent is not a federal constitutional tort as long as the state provides a remedy). Carvajal argues that, because Dominguez was acting as a federal agent, his state law claim would be barred. But Carvajal cites no caselaw supporting this statement, and *Bontkowki* suggests that a state law claim against a federal agent for malicious prosecution is not be barred, even if Carvajal could have been required to follow the procedures of the Federal Tort Claims Act. *Bontkowski*, 305 F.3d at 760.

In any event, Carvajal could not prevail on his claim of malicious prosecution because it would suffer the same defect as Carvajal's claims of false arrest and unlawful search and seizure.

A grand jury indictment is prima facie evidence of probable cause for a court proceeding, which Carvajal would have to rebut in order to establish malicious prosecution. *See Mannoia v. Farrow*, 476 F.3d 453, 459 (7th Cir. 2007) (lack of probable cause an essential element of a malicious prosecution claim under Illinois state law); *Bontkowski,* 28 F.3d at 37. As discussed above, Carvajal has not presented sufficient evidence to rebut the prima facie evidence of probable cause from the grand jury indictment; there is no evidence in the record that Dominguez's reports and identification were what led to the grand jury indictment. Finally, to the extent that Carvajal frames his "deprivation of liberty" count as a denial of his right to a fair trial based on Dominguez's alleged withholding of exculpatory evidence (Pl. Resp. at 8), that claim is covered by Count III's *Brady* claim.

Carvajal's perjury claim also fails. As even Carvajal recognizes, police witnesses are entitled to absolute immunity from perjury claims for their testimony at trials and pretrial proceedings. (Pl. Resp. at 10); *Briscoe v. LaHue*, 460 U.S. 325, 341-42 (1983); *Ienco v. City of Chicago*, 286 F.3d 994, 1000 (7th Cir. 2002). Carvajal argues, however, that an exception to the absolute immunity for complaining witnesses applies here. A complaining witness,"who actively instigated or encouraged the prosecution of the plaintiff" is entitled to only qualified and not absolute immunity. *Curtis v. Bembenek*, 48 F.3d 281, 286 (7th Cir. 1995) (internal quotations and citations omitted); *see Malley v. Briggs*, 475 U.S. 335, 340-41 (1986); *Chicago United Industs., Ltd. v. City of Chicago*, No. 05 C 5011, 2007 WL 1100746, *7 (N.D. Ill. Apr. 10, 2007). As set out above, without evidence regarding the grand jury proceedings, the record before the court does not support a determination by a reasonable jury that Dominguez played a role in actively instigating or encouraging Carvajal's prosecution. Dominguez's sole role in the

13

investigation of Carvajal was his participation in the April 2001 undercover operations, his identification of Carvajal, and his writing of two police reports dated May 14, 2001. Dominguez did not have any role in procuring the cell phone number, registered to Carvajal's ex-wife, that he used to make the arrangements for the April 2001 transactions. Dominguez also did not testify before the grand jury, and the record before the court is entirely silent as to what evidence was presented to the grand jury to secure Carvajal's indictment and superceding indictment. Thus, a reasonable jury would have nothing but speculation on which to base a conclusion that Dominguez could be considered a "complaining witness" under the exception for absolute immunity for testimony. Summary judgment is granted in favor of Dominguez on the claim of perjury.

Finally, as to Carvajal's claim that Dominguez withheld exculpatory evidence in violation of his due process right to a fair trial under *Brady v. Maryland*, 373 U.S. 83 (1963), Carvajal identifies as exculpatory Dominguez's alleged failure to tell the prosecutor that he was given Carvajal's name and photographic image before the first transaction on April 16, 2001. According to Carvajal, this evidence would have impeached Dominguez's testimony at trial that he did not know Carvajal's name or see his photograph until after the April 16, 2001 transaction and undermined the credibility of Dominguez's post-April 16, 2001 identification of Carvajal. Carvajal argues that the impeaching evidence was material since the evidence would have changed the outcome of the suppression hearing, and the withholding of the evidence denied him a fair trial. In response, Dominguez first argues that, because Carvajal was acquitted, the allegedly withheld evidence could not have changed the outcome of the trial, and thus there was no *Brady* violation. Dominguez also contends that, even if he were familiar with Carvajal's

14

name and photograph before April 16 and failed to disclose the evidence, Carvajal cannot establish that the disclosure was material in that it would have caused the prosecutors to forego Carvajal's indictment and prosecution.

The withholding of exculpatory or impeaching evidence by the government, whether deliberate or inadvertent, that is material and favorable to the defense violates a defendant's due process right to a fair trial. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Wilson*, 481 F.3d 475, 480 (7th Cir. 2007). The obligation to disclose exculpatory or impeaching evidence that is material and favorable to the defense generally lies with the prosecutor, unless an officer withholds the information from the prosecutors, at which point, the officer can be held liable under *Brady*. *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001). Typically, a *Brady* claim is brought by a convicted defendant, and the court must analyze retrospectively whether the withheld information was material, in the sense that there is a reasonable probability that the result of the trial would have been different if the evidence had been disclosed. *Strickler v. Greene,* 527 U.S. 263, 280 (1999); *United States v. Warren*, 454 F.3d 752, 759 (7th Cir. 2006).

Whether an acquitted defendant, who could not establish that the withheld evidence affected the result of the trial, can have a *Brady* claim, however, is an open question in the Seventh Circuit. Our district court is split on the issue. One district judge has held that an acquitted defendant could not show that withheld evidence was material because the withheld evidence did not affect the outcome of the trial. *See Gregory v. Oliver*, 226 F.Supp.2d 943, 953 (N.D. Ill. 2002) (J. Shadur). Several other district court judges have disagreed with *Gregory*'s conclusion that an acquitted defendant has no due process claim under *Brady*. *Gomez v. Riccio*, No. 02 C 5911, 2005 WL 2978955, *6-*7 (N.D. Ill. Nov. 1, 2005) (J. Grady)*; Kidd v. City of*

15

*Chicago,* No. 02 C 9534, 2003 WL 22243938, *2 (N.D. Ill. Sept. 26, 2003) (J. Bucklo); *Carroccia v. Anderson*, 249 F.Supp.2d 1016, 1023-24 (N.D. Ill. 2003) (J. Kennelly). According to these district court judges, "a trial is not rendered fair simply because it ultimately results in an acquittal." *Carroccia*, 249 F.Supp.2d at 1023; *see Gomez*, 2005 WL 2978955 at *7. As these district court judges see it, the results-oriented approach was only necessary for courts' needing to assess retrospectively the effect of the withheld evidence, whereas in the circumstance of an acquitted defendant, the court "must evaluate the officer's action on a prospective basis." *Id.* at 1024. While an "eventual acquital may suggest that the withheld evidence was not material," an acquittal "alone does not show that police officers complied with *Brady* or that the defendant's trial was fair." *Id.* at 1024. Based on this court's reading of the two points of view on this issue, the court finds that the approach taken in *Carroccia* fits best with the due process right to a fair trial guaranteed by the Constitution. An acquitted defendant may still be able to establish that the withheld evidence was material.

Having established that Carvajal's acquittal does not extinguish his *Brady* claim, the court turns to the question of the withheld evidence and its materiality. In doing so, the court first must determine whether a reasonable jury could conclude that Dominguez withheld the information that he had been given Carvajal's name and photograph before the April 16, 2001 transaction. Hunter's deposition testimony establishes that Hunter learned Carvajal's name by April 15, 2001, and that Illinois Secretary of State would have completed the April 9, 2001 request by the intelligence analyst of Carvajal's photograph within a week, by April 16, 2001. Although Hunter does not specifically remember showing Dominguez the photograph or name of Carvajal, both Hunter and Dominguez testified at their depositions that, if Hunter had Carvajal's

name and/or photograph before the April 16, 2001 transaction, he would have given them to Dominguez. Taking all evidence and inferences in favor of Carvajal, the court finds that there are genuine issues of material dispute regarding whether Dominguez saw Carvajal's name and photograph before the April 16, 2001 meeting. Furthermore, if Dominguez was given Carvajal's name and photograph before April 16, 2001, but testified and continues to maintain that he was not given that material before April 16, 2001, an inference may be drawn that Dominguez was lying about the date on which he received Carvajal's name and photograph. Supporting this inference is the failure by Dominguez to document his identification of Carvajal's photograph, despite standard law enforcement procedures to do so.

The court also determines that, if Dominguez withheld that information, it would have been material for impeachment purposes. First, evidence that Dominguez had received Carvajal's name and photograph before the April 16, 2001 could lead a reasonable jury to believe that this information biased or undermined Dominguez's identification of Carvajal. Second, had Dominguez testified at trial that he had not received Carvajal's name and photograph before April 16, 2001, evidence that he had would contradict and impeach such a statement. Moreover, although Dominguez bases his argument that the withheld evidence was not material on an assumption that the prosecutor would still have proceeded to trial in the case, the reaction of the prosecutor to the evidence is not the standard for deciding the materiality of the evidence. Rather, the court looks at whether, "at the time the evidence is concealed," could it "be expected to affect the outcome of the case." *Carroccia*, 249 F.Supp.2d at 1024. In this case, the court concludes that there are genuine issues of material fact regarding whether a *Brady* violation occurred.

To the extent that Dominguez raises a qualified immunity defense to the *Brady* claim, the defense fails at summary judgment. The evidence is disputed as to whether Dominguez intentionally lied about the date on which he received Carvajal's name and photograph, and the boundaries of *Brady* as applied to this case have long been established. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995) (exculpatory evidence withheld by police must be disclosed); *United States v. Bagley*, 473 U.S. 667, 677 (1985) (impeachment evidence must be disclosed); *Brady*, 373 U.s. 83 (violation of due process to withhold exculpatory evidence).

## CONCLUSION

Accordingly, defendant's motion for summary judgment (Dkt. No. 57) is granted in part and denied in part. Summary judgment is granted in favor of the defendant on Counts I, II, and IV. Summary judgment is denied on Count III. All previously set dates still stand. Parties are encouraged to discuss settlement.

ENTER:

_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: June 11, 2007